Thank you, Your Honor. May it please the Court, my name is Gavin Martinson on behalf of Petitioner-Cross Respondent, Harvard Maintenance Incorporated. I'd like to reserve five minutes of my time for rebuttal. Yes. Yes, that's fine. At the height of safety concerns and unknowns regarding the COVID-19 pandemic in March of 2020, one of Harvard's employees, Karina Cruz, had a series of run-ins with her supervisors in which she refused to work, interrupted a safety meeting, refused to follow guidance from her supervisors, raised her voice on a couple of occasions, once in the presence of Harvard's main client, and that resulted in a suspension and then her termination, for which she then filed the unfair labor practice charges that are the underlying matter for this case. The ALJ decided and then the Board confirmed. And despite all of those issues that I just went over, the ALJ and then the Board found that the company had violated the National Labor Relations Act in its interactions with Ms. Cruz. And it did so based on three principal rationales that the ALJ listed in his decision. And those are, first, that Cruz was more credible, according to the ALJ, than the company's witnesses because she supposedly testified consistently at the trial. And she was – she had no difficulty recalling facts with the ALJ. And in addition to that, the ALJ found that the incomplete and largely inaudible audio recordings that Ms. Cruz had submitted into evidence regarding a couple of these interactions did not corroborate the testimony of the company's witnesses and did corroborate Ms. Cruz's. And so based on those findings, the ALJ and then the Board found that the company had violated the act. What standard of review do we apply to those findings by the ALJ? Yeah, those are substantial evidence questions. And, you know, as this Board has found consistently, including in recent cases, if the ALJ or the Board ignores significant pieces of evidence in the record, they cannot meet the substantial evidence. Likewise, with respect to the credibility findings that provide the foundation for the decision here, if the ALJ's decision is inherently inconsistent in the way that the ALJ applies the evidence in the record, then this Board is not bound to follow the ALJ's findings. And then finally, of course, this Board is required to consider any evidence in the record that would contradict the findings that the ALJ made and that the Board confirmed. And a look at the record indicates that the ALJ did ignore significant portions of the record and the ALJ's decision is in itself internally inconsistent, especially with respect to the way that the ALJ relied on the audio recordings. So if we'll start with, there were three instances that made up these UOP charges. The January 4th phone call, the March 18th incident in which Ms. Cruz ripped the rubber gloves in the safety meeting, and then the next day, the March 19th incident where she is sent home and then ultimately terminated. And I think that the March 18th incident is a good place to start to show the issues with the ALJ's decision. So the ALJ, as I mentioned, specifically said that he was going to side with Ms. Cruz's testimony because it was corroborated by the audio records and the testimony of the supervisors was not. But then the ALJ went on with respect to the March 18th incident to cite and find that the supervisor's version of events, which is not corroborated by this imperfect audio recording, was actually what occurred and ruled against Ms. Cruz's version of events. And that's not remarkable and it's not wrong, but what is significant about that is on the one hand, the ALJ is saying that the audio recordings trump, that the audio recordings here support and corroborate Ms. Cruz and they contradict the company's witnesses. But with respect to the March 18th incident, which there was an audio recording, the ALJ specifically found, even though this version of events was not corroborated by the audio recordings, that the company's supervisor's version of events was accurate and not Cruz's. And in doing so, it highlights the inherent inconsistency that the ALJ displayed in its own ruling. In addition, there were aspects of the March 18th meeting that are in the record that the ALJ and then the board did not consider. For example, the ALJ found, even though Ms. Cruz testified otherwise, that Ms. Cruz disrupted the safety meeting on March 18th by ripping the gloves and by contesting the company's ability to force these maintenance employees to wear gloves. As a reminder, this is March 18th of 2020. Less than two weeks before, this was in New York City, less than two weeks before there was an official pandemic classified in New York City and across the country. We all remember those times. And these are maintenance employees who are tasked with cleaning office buildings. And they're being told that they need to wear gloves. And in this meeting, Ms. Cruz rips the gloves in protest. But she also did so using profanity during the safety meeting. And the ALJ does not mention that. I didn't take it that Cruz was objecting to the workers wearing gloves. She tore the gloves apart. She said she wasn't her argument that the gloves were inferior. Your Honor, what the ALJ found, and this is on page 1160 of the record in the ALJ's decision, Cruz spoke out saying the company cannot force employees to wear gloves. So that was the source of—that's what the ALJ found. And that's what the supervisor testified. Now, it's not what Cruz testified to, in fairness. But that's my point here, which is that the ALJ disregarded Cruz's testimony here, even though Cruz's testimony, or rather the company's supervisor's testimony, was not corroborated by this audio recording. But everywhere else, the ALJ then wants to say that if the recording is going to corroborate the company witnesses, then the company workers are inherently under-reliant. I didn't understand the record when she said that. I thought she was saying, you can't force me to wear inadequate gloves. Not that I want to work without gloves. Yes, Your Honor, that may be a way to interpret the record. My point is that the ALJ is saying that the factual finding that the ALJ made was that she was saying, you cannot force me to wear gloves. There's no mention in the ALJ's decision of the quality of the gloves. But the profanity that she used does indicate that she does not want to wear the gloves, and one interpretation could be that she thinks that they're inferior. But this is a disruption of a safety meeting. And during that same testimony, and one of the parts you can hear clearly on this audio recording of this March 18th meeting, is that she says she's just expressing her own opinion. And so this is something that the ALJ and the board don't cite to or reference at all. And that certainly cuts against any finding that there's protected, concerted activity with respect to the gloves. And so I think— I'm going to interrupt you because you've used up well over half your time, and you haven't touched on what I think is your strongest point, although I don't understand why you stuck it in in the last five pages of your brief, and that's the question of reward of consequential damages, which is, for you and your firm and your various clients, it seems to me is a pretty important issue. Maybe you don't think it carries much weight. Maybe I'm mistaken. The dispute about the evidence that you've been talking about, under the standard of review, you have a really steep climb, but this is a pure question of law as to whether the statute authorizes the reward of consequential damages. That's a question that's separate from the Seventh Amendment question because if we should decide that equitable relief only is what is allowed, we would not need to reach, necessarily, the Seventh Amendment. Yes, Your Honor, thank you. And you've summarized it exactly right, and I agree with you. It is a strong argument, and it's laid out in our brief, and I'm happy to talk about it here. The NLRA specifically allows the board to award equitable damages, and it's done so for decades and decades. And recently, in a board decision called Thrive, they pushed open the door to additional remedies, consequential remedies. This court, in reviewing the Thrive decision, vacated the portion of the Thrive order on which the Thrive damages were based. And so our position is that those damages are not even permitted under the NLRB's standards anymore. But regardless of that, the consequential damages that the board awarded, in this case, future pecuniary harm. You disagree with the Ninth Circuit's recent decision in Macy? Yes, Your Honor. As we cited in our brief, there is that Ninth Circuit decision. We think that the Third Circuit's decision in Starbucks is better reasoned. You disagree that the NLRA gives the board the power to order restitution or back pay or any other equitable remedy for an employee who has been damaged by the employer's unlawful labor practice of locking out employees without giving any instructions as to how they should comply? Yes, Your Honor. So the statutory language says... I guess I'm persuaded that Macy is right and we should follow it. And it's consistent with the NLRA. Respectfully, Your Honor, I think that the Third Circuit's decision in Starbucks is more consistent with the language in the NLRA. The damages portion of the NLRA says that the board can order a person to cease and desist from unfair labor practices and take affirmative action including reinstatement of employees with or without back pay. That's what we have here is affirmative action, right? I think that part of the award is a reinstatement with back pay, but it goes beyond that, and that's what the Starbucks decision talks about. So we also have an award of future pecuniary harms, which this court in the Thrive decision called consequential-type damages, unique consequential-type damages. And then we also have an award in the ALJ's decision and the board's affirmance of that decision that requires, for example, the company to pay for the cost of the employee's search for additional jobs. Those are equitable records in my opinion. I think that Starbucks got it right that the NLRA allows for equitable remedies only, and the remedies that are included here are consequential compensatory-type damages that are legal remedies that go beyond the equitable remedies that the statute provides. So the cost of additional job search, did you say is equitable? No, I misspoke. I thought you misspoke. Thank you for correcting me. No, legal. That goes beyond the equitable remedies. Thank you. Well, that's the conclusion to be reached. It seems to me that a lot of what you're saying is question-begging. You start off by saying it's consequential damages, legal damages, et cetera. But that's something that must be proven. And I think that the Macy decision makes a very good argument for the position that anything that the board orders to repair and restore employees to the position they were before the unfair labor practice by his or her employer is an equitable remedy, or it can be an equitable remedy. I see that my time has expired. I want to just respond quickly to your question, which is the definition of equitable remedies is to replace what has been withheld from the employees, and that is why back pay in this kind of an instance qualifies as an equitable remedy. But when you're paying for future pecuniary harms, any kind of consequential damage, including searching for jobs, that's not replacing things that have been withheld. Those are legal damages for violations of the legal duty. I'll stop there and reserve the rest of my time for rebuttal. Yes, you've saved time for rebuttal. Thank you, Mr. Martinson. Mr. Laurel? Thank you, Your Honor. May it please the Court, Greg Laurel for the National Labor Replacements Court, asking this Court to enforce the Board's order because it's supported by substantial evidence and subtle law. If I may start with the unfair labor practice as we have here, we have multiple threats, suspensions, and a discriminatory discharge. It is true that the Board made essential credibility determinations here, and I think they're well supported under the standard of review, which looks to whether the Board's findings are patently unreasonable or unsupported by evidence, or are self-contradictory or based on no reasoning at all. It's a very high standard for me, and I don't think it's met here. I think here the Board made reasonable credibility determinations, comparing witnesses and seeing who was more credible, seeing who was more corroborated by the take. And I wanted also to mention Mr. Mellon, the Vice President, who was discredited because while he was a senior Vice President who was presented as an expert of why employees were disciplined and how certain things at the company could work, he couldn't explain certain things that underlie the Board's finding of an unlawful discharge. He couldn't explain why she was treated differently than other employees who had been treated more than willingly. He couldn't explain why the company departed from its own practices by not giving her a written explanation of the discharge. He couldn't explain plausibly why they didn't conduct an investigation beyond just talking to supervisors. They didn't talk to their crews. They didn't talk to other employee witnesses. So I would say, overall, there's no basis for disturbing the judgments of the Board's reasonable credibility findings here. And I'll gladly answer any questions about that. And I also think there are a lot of violations here. The threats, the suspension, the discharge, they're very well supported. These are situations with the threats where the employee, for example, will contact the supervisor and say, I plan on filing a human grievance or unfairly retract discharge in full, well, that may be the right thing you might recommend exercising. And you have a similar threat. You have, after she gets home the first time, you have a meeting with Vice President Dallas, and he's like, I'd like us to move on as a pandemic, let's put this in practice. And she speaks up and says, I need to express myself, as he's acknowledged on the voice of my co-workers, and he says, you can do that after the pandemic. If you need to do it now, you don't have this conversation with his words. So what I'm saying is, you have all this up. You have clear evidence of statements that would have an unlawful, reasonable tendency to coerce into the act. You have both the background and circumstantial evidence to support a finding of unlawful motive for the discharge and suspensions. And I'm happy to answer any questions about that, Your Honors. I know we also have the issue of the remedies. I don't know if Your Honors would like to? Didn't you make an argument below that we don't have jurisdiction to entertain the department's argument because of lack of objection during the board meeting? My opponent, the employer, didn't raise any objection to try to make co-relief before the board. So they make a futility argument on that, don't they? That it would have been futile to raise the objection so we can still consider it? Is that right? Is that what they did or not? They didn't. They make that argument now. They make that argument now. But their point is that because it's a constitutional argument, they don't have to make it to the board. They have a very broad exception to Section 10B's bar on consideration of claims that were brought to the board. But precedent doesn't bear out that just because it's a constitutional argument, it's futile to bring it to the board so we can go ahead and wait to go to court the first time. That argument is not supported. So since they raised no argument at all to challenge the dry remedy at any point during the proceedings before the board, their consideration of it is now barred by Section 10B of the Act. And I think it's important for the board to consider that. They did not, and they certainly didn't raise the specific arguments they're making now. Nobody brought that to the board's attention. So I do think there's a very strong argument that the remedial challenge is barred by Section 10B of the Act. And I'm happy to answer any questions about that. I also believe the remedy is consistent with the Act and its purpose, and it is not barred by the seventh amendment. And the reason for that is when you look at the statutory authority, and when you look at the purpose of the remedy, not just labels like consequential, the Act is very broad. The board makes sure that it is as effective as the Act's purposes. As the person noted, a key purpose is to restore employees to a position that would have occupied absence of violation. That is what the board said it's doing here, and that's what it is doing. And under those circumstances, decades of law say that make-full relief is consistent with the Act. And what's here is not. The board has for decades issued relief to destroy the status quo ante that goes beyond just reinstatement of back pay, which is by the illustrated example. How does it restore the status quo ante by awarding some kind of consequential damages for a search for a future or different job? Well, you're doing two things. First of all, as I believe the Ninth Circuit said in AC's and the board's claim to the trial, terms like consequential are an act. That's not in the court law, which is not what the board's doing. The court law is primarily concerned with addressing private injuries. The board, in doing unfair labor practice proceedings and remedying unfair labor practices, is vindicating a public right where money for employees is a stand-in or an effectuation of that public right because if employees do not feel free to exercise their rights due to the unremitting coercion and violations, the Act won't work. Employees won't exercise their rights. It will not facilitate labor duties. So to answer your question, those are remedies that make employees whole, which is the board's job of vindicating public rights. Well, but you're the one who used the term status quo ante, and that doesn't happen if the employee goes off and looks for a different job, a new job. Well, it's to make the employees whole and reduce the impact and the coercion of the unfair labor practice well enough so that employees will feel free to exercise their rights in the future. And the board has for decades granted remedies which you just won't approve of later. Well, these employees were locked out. They didn't just jump up and go look for another job. No, they were locked out. Pardon? Is that right? Not that I'm aware of, but we have the discharge. I want to make sure I understand the question. We have the discharge of Ms. Cruz. I'm sorry. Our sound system is not very good. You'll have to speak up for us. I'm sorry. Yes, sir. I'm sorry. Can you hear me now? One thing is this case comes down as far as maypole relief to the discharge and suspensions of one employee, Ms. Cruz. She was unlawfully discharged, as we discussed this morning. The board ordered that she be made... I think I got the cases a little mixed up. I'm sorry. Oh, no, no. That's the problem. I don't believe there was a lockup here. But what I would say is a lot of the arguments my opponents make, like it has to be equitable, are not necessarily worn out by precedent, the text of the act, the fact that the Supreme Court hasn't used common law distinctions between equity and legal damages to judge a court's remedy. What the courts have done, and they've had no problem with it, is say, is the board reasonably restoring the status quo by making employees whole, vindicating that public role? And if it goes beyond that, the courts have had no problem striking board remedies down without resorting to distinctions between equity and legal damages. But also, if it did need to be equitable, frankly, it is, for the reasons the Ninth Circuit explained to Macy's, which is that what the board is doing is making employees whole, and any resemblance of that to consequential damages is just a coincidence because the board isn't just addressing private wrongs. It's exercising a public role. Do you acknowledge that there's a circuit split now on that, irrespective of what we might do? I acknowledge, yes, the circuit split between Macy's, the Ninth Circuit, and the Third Circuit at Starbucks. I think Macy's has the better of the argument because it's more consistent with the act and pressing it. Macy's avoids just looking at the label, like compensatory and et cetera. Macy's says, what is this about? And Macy's says, what you have here, the Thrive remedy, is to open a back pay order because you're attempting to redress the impact of violations and make employees whole, and yes, restore the status quo ante, and that that is a proper thing for the board to do. It's consistent with precedent. And I know this court has said the board remedies aren't, quote, damages as such. At the end of the day, I think the Ninth Circuit had the better argument. And also, when you look at the Third Circuit, there's a focus on whether the board is limited to equitable relief that merely restores to employees what the employer lawfully would count. But that's not consistent with precedent or, frankly, most employers' interest because what the board does with court approval is say, let's look at net back. Let's look at inter-emergence. Let's look at reasonable efforts to find a substitute job and pay. Well, let me give you a hypothetical. You may think it's an extreme hypothetical, but suppose that this employee said, well, you know, I was out of a job. I'm entitled to my back pay to be made whole. And, oh, by the way, during the time that I was out of a job, I was unable to buy a new house, which I would have been able to buy at 3% back then. But today, if I go out to buy a new house, I have to pay 7%. So I'm entitled to some kind of direct monetary compensation to make myself whole now that I can go buy a house for the difference, which is 4% on the cost of the house. Otherwise, I'm not made whole. That would be a consequential damage. I assume you would agree. Is that something that the board could award? The answer is the board would look at, as it said in the trial, whether at some point it is to suspect order or to possibly remove from the violations and would look at whether the remedy is consistent with its precedent. And I think I know there will be concerns of application when you're looking at causation and when you're looking at what reasonably makes employees whole. And as the court said in Macy's, the board is not going to go out looking for extremely unsupported remedies. There would be a compliance hearing, and the employer would have a chance to rebut the general counsel's case for the remedy. But it would be within the scope of the statute, in your view, to make that award as an element of whatever total award was given. I don't view the Thrive remedy as saying we're going to award every possible loss that could be caused by a breach to an unfair labor practice. That would be the purpose of the compliance process to figure out what is the link between the harm and the unfair labor practice and to try to make the most of it. I don't know whether the board would award a relief like what you described depending on the specific circumstances. Okay, but my question was, you're giving a fair answer, and I understand your position, but my question was, in your view, that would be within the scope of the statute depending on the facts and circumstances. It would be within the scope of the act if it effectuates the act's policies and didn't go beyond the purpose of making employees whole. I'm sorry, it's tougher to be more specific than that. No, you've given a fair answer, and I don't mean to be giving you a hard time about that, but I think it's important to understand what the board's position is and how broad the award of consequential damages might be in an appropriate situation. Right, I understand your point. With the same caveat that consequential damages, just so we're clear about the usage in my understanding, does something toward or addressing private harms, but I understand the substance of what you're saying. And on the substance, I also want to point out I understand whether you have to reach the substance of it. It could depend on how you rule on the statutory issue. But as we explained earlier, and I'm happy to answer any questions, that issue has been decided for a long time now that the board's unfair labor practice proceedings fall within the public rights doctrine going back to Supreme Court's decision in Jones and Lawton and Steele because unfair labor practice proceedings do not sound in common law. They were unknown to the common law. And I believe this was almost a century ago they were even anachronistic to the common law. It also goes back to Stern v. Marshall, doesn't it? In terms of public v. private rights. Yes, sir. But I was just pointing out as far as the 7th Amendment goes, not only is it covered by the public rights doctrine, but the remedy itself. As we've been discussing, so I won't belabor it, it is also backward in nature if it needs to be. And as the Supreme Court pointed out in Jones, when you have monetary relief or back pay or other make-able relief, it's incidental to make-able relief. That, too, is not going to go on for 7th Amendment purposes. That's the Supreme Court's holding of Jones. I point this out because my opponent would like to suggest that Jones is no longer good law, but it is. And the Supreme Court has said so self-supportingly. In the case of my opponent's sons, and as much as my opponent might wish that weren't so, the Supreme Court hasn't said that Jones has been overruled. It's fundamental holding that the 7th Amendment does not apply to courts, I'm sure they would practice proceedings. And so I don't think I can answer any of the questions that you're asking. I fully believe the violations we have here are all well-supported, that the remedies consistent with the board's statutory authority, particularly when we look at the function rather than just labels, and that the 7th Amendment issue, where the court did reach it, has been decided by the Supreme Court and also has supported precedent in this court that we suggest. Thank you, Mr. Lowe. Mr. Martinson for rebuttal. Thank you. I think I'll start with, trying to address the distinction that this court is forced to wrestle with between what are equitable remedies or damages versus what are legal remedies. And I think that a good way to classify those is on the equitable side, you have the status quo ante. If what we're doing is trying to restore the status quo ante, then those are equitable remedies. And that is what the statute permits. The NLRA permits reinstatement with that. It doesn't permit any kind of remedy that the board thinks may be equitable. It allows for cease and desist, but also, with respect to monetary damages, reinstatement with that. So status quo ante would be an equitable remedy. A make-whole relief would be legal. And I think, Judge Smith, to your hypothetical, that's exactly the point that you highlighted, that hypothetical with the housing issue. That it would be a make-whole relief. This is a quote-unquote damage that the employee has suffered because of the unfair labor practice that they're now unable to buy the house at a cheaper price or a cheaper interest rate. And so to make them whole, a court, an Article III court, imposing legal remedies, could award those damages. But an executive agency, like the board, cannot. And so I think that is the principal distinction there. With respect to jurisdiction, I'd like to touch on that quickly. You know, we can see that, you know, the company never raised this constitutional damages issue before the board. But this is a unique circumstance. To use the language of the statute, extraordinary circumstances here. For a couple reasons. First, as I mentioned, you know, earlier in my opening argument, those thrive damages have already been vacated by this court. Second, this is a unique circumstance in which the board specifically noted in the footnote in its decision that this issue was considered, that member Kaplan, a member of the board, descended from that portion of the damages remedy in the decision, citing his dissent in the thrive NLRB decision itself, which specifically raised these very issues that we're talking about. Whether, you know, the statute allows for these kinds of remedies and whether they qualify as consequential or legal. And that's the first time it came up, was in the dissenting opinion, when it doesn't even tangentially reference that? That's correct, yes. It's only in that footnote. But that highlights, I think, the extraordinary circumstances here and to use Judge Smith's word, the futility of having to raise it before the board. First of all, this is a constitutional issue that the board does not have. Not the statutory. Fair enough. I'm talking about the distinction between the statutory. Fair enough, yes. So it's an issue that, you know, the board has already considered. The statutory is an issue that the board considered in this very case and decided that it was still going to award those thrive damages. And so to specifically raise it... I mean, there was an exchange about thrive damages before the board's opinion issued or not? That's what I'm getting at. No, I'm not aware of any exchange. I'm aware of it being discussed, you know, in detail in the footnote in the decision, which raised the issue exactly as it would have been raised by the parties, which is why I think futility is a good word to use here, that had the parties raised it, had the company raised it, there would have been no additional issues or arguments or anything raised with the board that the board did not in and of itself consider a note in the footnote there. I see that my time is about up. Yes, your case is under submission. Thank you, Mr. Martins. Last case for today, Worldview Connect Global.